## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

SHAD RHAMES,                                )
                                            )
              Plaintiff,    )
                                            )
v.                                          )     Case No. 16-CV-0747-CVE-JFJ
                                            )
CITY OF BIXBY and IKE SHIRLEY, in           )
his Official Capacity,                      )
                                            )
              Defendants.   )

## OPINION AND ORDER

Now before the Court is Defendants' Motion for Summary Judgment and Brief in Support (Dkt. # 33). Defendants argue that plaintiff was not a qualified person with a disability and that he cannot establish a prima facie case of discrimination under the Americans with Disabilities Act as amended, 42 U.S.C. § 12101 et seq. (ADA). Plaintiff responds that defendants actively interfered with his medical treatment and terminated his employment based on a mistaken belief that he had permanent restrictions that would prevent him from working as a police officer.

## I.

Shad Rhames was hired as a police officer by the City of Bixby (the City) in December 2001. Dkt. # 2, at 2. The job description for a police officer provided by the City states that the major duties include patrolling on foot or in a vehicle, investigating possible crime scenes and suspicious activity, and apprehending and arresting persons suspected of criminal activity. Dkt. # 33-21, at 2. A police officer must respond to citizen complaints and perform crowd control if needed, and there are also administrative duties, such as preparing investigative notes and reports and drafting search warrants. Id. The position requires skill in driving a patrol car and knowledge and familiarity with the use of firearms. Id. at 3. The physical demands of the job include lifting light and heavy objects,

using tools that require a high degree of dexterity, and using physical dexterity and force to apprehend suspects. Id. at 4. A police officer must possess the physical strength and stamina needed to chase and subdue fleeing suspects, including the ability to walk or run for long distances and lift or drag up to 165 pounds. Id.

Rhames suffered an on-the-job injury in 2003 and he was placed on light duty. He was medically cleared to return to full duty about 18 months later. Dkt. # 2, at 2. On April 9, 2012, Rhames stepped into a hole and twisted his left knee while chasing a fleeing suspect, but he finished his shift and did not immediately seek medical attention. Dkt. # 33-1, at 5-6. In June 2012, Rhames requested to see a doctor for examination of his left knee, and his paperwork was processed as soon as he made his request. Id. at 11, 21-22; Dkt. # 33-2. Rhames visited an orthopedic specialist, Jeff Fox, M.D., who diagnosed Rhames with a strain of the left knee. Dkt. # 33-4, at 2. Dr. Fox would allow Rhames to return to work only if it was limited to a "sit down job." Id. Ike Shirley is the Chief of Police for the Bixby Police Department, and he testified in his deposition that he operates a small police department that does not have a full-time light duty position for police officers. Dkt. # 33-5, at 7. However, the police department can offer short-term accommodations of light duty when it appears that a police officer is likely to resume all of the duties if permitted a short period of time to recover. Id. at 7-8.

Rhames visited Dr. Fox several times but decided he wanted a second opinion. His workers' compensation attorney requested a referral to a new physician. Dkt. # 33-4, at 5; Dkt. # 33-6. Rhames was unhappy with the treatment being provided by Dr. Fox and he felt that Dr. Fox was actually making his knee worse. Dkt. # 45-6, at 2-3. Rhames was referred to Darnell Blackmon, M.D., and Dr. Blackmon performed two arthroscopic surgeries on Rhames' left knee. Dkt. # 33-1,

at 29-30; Dkt. # 45-7, at 3-4, 7-8. After the first surgery in February 2013, Dr. Blackmon placed restrictions on Rhames as to bending, squatting, and climbing, and he indicated that Rhames was likely to receive a full release to work in three months. Dkt. # 33-7, at 2. On April 19, 2013, the City offered to allow Rhames to return to work on light duty and acknowledged all of the restrictions recommended by Dr. Blackmon. Dkt. # 33-8. Rhames further injured his knee during physical therapy, and Dr. Blackmon performed a second surgery on Rhames' knee to repair a torn meniscus. Dkt. # 45-7, at 5. The City renewed its offer for Rhames to return to work on light duty and set a date of June 17, 2013 for Rhames to report. Dkt. # 33-10. The City did not have a full-time light duty position for police officers, and this was intended to be a short-term accommodation to allow Rhames to return to work before he had made a full recovery. Dkt. # 33-5, at 3-7. Rhames did not accept the City's offer to return to work on light duty and, in August 2013, the City again renewed its request that Rhames return to work on light duty. Dkt. # 33-11. Rhames returned to work on light duty under the supervision of Sergeant Blake Annis, and he remained on light duty from August 2013 to June 2014. Dkt. # 33, at 8; Dkt. # 45, at 5.

Rhames received numerous oral counselings and reprimands from Annis. Annis prepared a disciplinary report stating that Rhames failed to appear at an implied consent hearing scheduled for January 25, 2013. Dkt. # 33-12. The report states that notice was "hand delivered" to Rhames, and that the revocation of the individual's driver's license was set aside due to Rhames' failure to appear at the hearing. Id. The reprimand was delayed because Rhames was off duty when the incident occurred.[1] Id. Rhames had been reprimanded in February 2012 for being unprepared to

_____

[1]     Plaintiff correctly points out that he was on leave at the time he allegedly failed to report for the implied consent hearing. Dkt. # 45, at 13.

testify at a telephonic hearing. Dkt. # 33-13. On September 8, 2013, Rhames was disciplined for failing to properly document time off and for other inaccuracies on his time sheet. Dkt. # 33-14. On December 11, 2013, Rhames received an oral counseling for failing to write a report after a citizen reported a possible crime. Dkt. # 33-15. Rhames claimed that he did not write a report because the victim produced a written statement. Id. at 3. In May 2014, Rhames was again disciplined for failing to complete his timesheet and improperly documenting sick leave. Dkt. # 33-16. On May 13, 2014, Annis completed an employee evaluation of Rhames and rated his work as unsatisfactory. Dkt. # 33-17.

Shirley had been advised by Annis and Sergeant Andrew Choate that there was not enough light duty work for Rhames, and Shirley testified in his deposition that this was a concern even before Rhames was offered a chance to return to work on light duty. Dkt. # 33-5, at 12-14. Rhames' direct supervisor, Annis, also did not believe that Rhames was performing the duties assigned to him at a satisfactory level, but Annis did not make the determination to remove Rhames from light duty. Dkt. # 33-9, at 10-14. On June 12, 2014, Choate drafted a memorandum recommending that "Rhames no longer be allowed to take advantage of our generosity of light duty," because Rhames had commented that he had no desire to return to full-duty and he was a negative influence on other officers. Dkt. # 45-31. Shirley does not recall that he received or reviewed Choate's memorandum, but he does remember speaking to Annis and Choate about performance issues raised in the memorandum. Dkt. # 51-1, at 2-15. Later in June 2014, Shirley advised Rhames that he did not have enough light duty work to support a full-time position and, as of June 24, 2014, Rhames was removed from light duty status. Dkt. # 33-18. However, Rhames' employment as a police officer was not terminated, and he was placed on workers' compensation leave. Dkt. # 33-1, at 57-58; Dkt.

# 33-5, at 16-17. The City continued to receive work status reports from Rhames' physician, Dr. Blackmon, and Shirley reviewed the work status reports. Dkt. # 33-5, at 22-28. On May 19, 2015, Dr. Blackmon submitted a work status report stating that Rhames was restricted from lifting, carrying, pushing, or pulling over 20 pounds, and he could not squat or climb ladders. Dkt. # 45-38. The report states in two places that the restrictions were permanent, and he was released from further medical treatment by Dr. Blackmon. Id. at 1, 3. The report further stated that Rhames was totally disabled from work and it gave no possible date that Rhames would likely be able to return to work. Id. at 3. This report was the first time that Rhames' treating physician had notified the City that Rhames had permanent restrictions that would prevent him from returning to work as a police officer. Dkt. # 33-5, at 27.

Shirley determined that Rhames would be unable to return to work as a police officer due to his permanent physical restrictions. Id. at 16-20; 27-28. Shirley sent notice to Rhames that a pre-termination due process hearing was set for July 1, 2015, because he had "received information that you are no longer capable of performing the essential job functions of a Bixby Police Officer" due to permanent physical restrictions. Dkt. # 33-22, at 2. The purpose of the hearing was to "make certain that a mistake is not made about the facts presented to [Shirley] regarding [Rhames'] ability to function as a police officer." Id. Rhames appeared at the pre-termination hearing and he was represented by counsel. Dkt. # 45-18, at 1. Rhames did not bring a doctor to testify on his behalf or any medical records, but he did testify that he believed he was still in need of medical treatment and he was seeking a second opinion concerning further treatment of his injured knee. Dkt. # 33-5, at 28; Dkt. # 45-18. On July 7, 2015, Shirley sent a letter to Rhames notifying him that Shirley had found just cause to terminate Rhames' employment due to Rhames' permanent physical

restrictions.  Dkt. # 33-23.  Rhames' employment would be deemed terminated on August 25, 2015 when his accumulated vacation time, sick leave, and compensatory time would expire.  Id.

Shirley submitted paperwork to the Oklahoma Police Pension Retirement Board (OPPRB) that Rhames was disabled for the purpose of serving as a police officer.  Dkt. # 33-5, at 5.  The OPPRB held a hearing on September 21, 2015, and Rhames appeared at the hearing with counsel.  Dkt. # 33-24, at 2.  The basic facts of the case were stated as follows:

> Mr Rhames has 13 years, 5 months and 4 days service with the Bixby Police Department.  The date of his knee/hip injury is April 9, 2012.  Mr. Rhames has been on injury leave for approximately 3 years.  The chief has reviewed the case and there is no position in the Bixby Police Department or the City of Bixby that Mr. Rhames can fill.

Id. at 3.  The OPPRB concluded that the City had "met its burden of proof that there is no position that [Rhames] can fill . . . ."  Id. at 3.  In addition to the proceedings before the OPPRB, Rhames also filed two grievances under the collective bargaining agreement (CBA) between the City and the Fraternal Order of Police Lodge No. 189.  The first grievance was filed on June 24, 2015, and he argued that the City had improperly deducted vacation time while he was on workers' compensation leave.  Dkt. # 33-28, at 2.  Shirley received the grievance on July 7, 2015, and he denied the grievance ten days later.  On August 13, 2015, Rhames filed a second grievance challenging the termination of his employment, and he claimed that the termination of his employment violated the the workers' compensation provision of the CBA.  The grievance was denied on August 26, 2015.  Dkt. # 33-29.

On December 13, 2016, Rhames filed this case against the City and Shirley alleging claims of discrimination and failure to accommodate under the ADA (first claim for relief), retaliation under the ADA (second claim for relief), retaliation in violation of the Family and Medical Leave

Act, 29 U.S.C. § 2615(a)(2) (FMLA) (third claim for relief), and intentional infliction of emotional distress (fourth claim for relief). Dkt. # 2. Defendants filed a motion for summary judgment (Dkt. # 33), and plaintiff filed a motion (Dkt. # 36) to reopen discovery after the motion was filed. Plaintiff's motion to reopen discovery was referred to a magistrate judge, and the magistrate judge granted plaintiff's motion. Dkt. # 44. Discovery was reopened for 20 days and plaintiff was permitted to take a second deposition of Shirley and Choate. Id. at 3. Plaintiff was also giving additional time to prepare a response to defendants' motion for summary judgment. Id. In light of plaintiff's request to reopen discovery, the Court struck all other deadlines in the scheduling order pending a ruling on defendants' motion for summary judgment.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Defendants seek summary judgment on each of the claims alleged in plaintiff's complaint. This includes plaintiff's claims of discrimination and failure to accommodate under the ADA (first claim for relief), retaliation under the ADA (second claim for relief), retaliation under the FMLA (third claim for relief), and intentional infliction of emotional distress (fourth claim for relief). Plaintiff's response to defendants' motion for summary judgment contains argument only as to his claims of disability discrimination and retaliation under the ADA (first and second claims for relief), and he makes no argument in support of his claims of FMLA retaliation or intentional infliction of emotional distress. Dkt. # 45. Defendant asks the Court to find that plaintiff has abandoned his claims of FMLA retaliation and intentional infliction of emotional distress. Dkt. # 51, at 2. The Court finds that plaintiff has failed to rebut defendant's arguments as to his claims of FMLA retaliation (third claim for relief) and intentional infliction of emotional distress (fourth claim for

relief), and the Court deems these claims to be abandoned.  <u>Coffey v. Healthtrust, Inc.</u>, 955 F.2d 1388, 1393 (10th Cir. 1992).

## A.

Defendants argue that plaintiff cannot establish a <u>prime facie</u> case of disability discrimination, because he cannot show that he was a qualified person with a disability.  Dkt. # 33, at 15-21.  Plaintiff argues that there is evidence that he had not reached maximum medical improvement (MMI), and that he was qualified to return to work on light duty or he could have remained on medical leave until he was fully healed.  Dkt. # 45, at 19-20.  Plaintiff also argues that defendants failed to engage in an interactive process to determine if there was an accommodation that could be provided to him that would allow him to return to work.  <u>Id.</u> at 21-22.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Disability discrimination can be shown by direct or circumstantial evidence. <u>See</u> <u>Reinhardt v. Albuquerque Public Schools Bd. of Educ.</u>, 595 F.3d 1126, 1131 (10th Cir. 2010). ADA discrimination cases based on circumstantial evidence are governed by the burden-shifting framework announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997).  Pursuant to this framework, the plaintiff bears the initial burden of establishing a <u>prima facie</u> case of discrimination.  If he does so, "then the defendant must offer a legitimate, non-[discriminatory] reason for the employment action.  The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." <u>Metzler v. Fed. Home Loan Bank of Topeka</u>, 464 F.3d 1164, 1170 (10th Cir. 2006) (citations

omitted).  In order to defeat a motion for summary judgment, the plaintiff must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual-i.e., unworthy of belief."  Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).

Because there is no direct evidence of discrimination, the Court will apply the McDonnell/Douglas burden shifting analysis.  In order to establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate:

> (1) that [he] is a disabled person within the meaning of the ADA; (2) that [he] is qualified, that is, [he] is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer terminated [his] employment under circumstances which give rise to an inference that the termination was based on [his] disability.

Morgan, 108 F.3d at 1324 (internal citations omitted).   The ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

> (B) a record of such an impairment; or

> (C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).  Impairments that are "transitory and minor" may not be used to support a claim of disability discrimination, and an impairment is transitory if it has an actual or expected duration of less than six months.  42 U.S.C. § 12103(3)(B).  The determination of whether a condition is transitory and minor must be made using an objective standard.  29 C.F.R. § 1630.15(f). In the Tenth Circuit, an ADA plaintiff has the burden to show "(1) he has an impairment that (2) substantially limits (3) a major life activity."  Smothers v. Solvay Chemicals, Inc., 740 F.3d 530, 545 (10th Cir. 2014).  The first and third requirements are matters of law for the Court to decide, but the

second requirement is a question of fact that must be submitted to a jury if there is a genuine dispute.

Id.; Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1129 (10th Cir. 2003).

Under the ADA, it is plaintiff's burden to establish that he has an actual or perceived disability. Steele v. Thiokol Corp., 241 F.3d 1248, 1253 (10th Cir. 2001). A person is disabled if he has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). The ADA was amended in 2011, and regulations implementing the ADA provide that:

(1) In general. Major life activities include, but are not limited to:

(i) caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions.

29 C.F.R. § 1630.2(i). The 2008 amendments to the ADA were intended "to correct what [Congress] viewed as an overly restrictive interpretation of the [ADA's] terms that had been adopted by the Supreme Court . . . ." Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1144 (10th Cir. 2011). The 2008 amendments were intended to broaden the scope of individuals who may qualify as disabled, but the amendments do not relieve a plaintiff of his burden to come forward with evidence that any limitations of a major life activity are caused by a mental or physical impairment. Felkins v. City of Lakewood, 774 F.3d 647, 652-53 (10th Cir. 2014).

In this case, defendants do not contest that plaintiff had a physical impairment that interfered with his ability to perform a major life activity, and the parties' arguments focus on whether plaintiff

was qualified with or without an accommodation to perform the essential functions of his job. The Court will assume that plaintiff can establish the first element of a prima facie case of disability discrimination, and the Court will proceed to the second step of the prima facie case. The Tenth Circuit has stated that the 2008 amendments to the ADA "did not fundamentally change the qualification requirement" of the ADA, and a plaintiff must still show that he is a "qualified individual" in order to recover under the ADA. Adair v. City of Muskogee, 823 F.3d 1297, 1306-07 (10th Cir. 2016). The parties dispute whether plaintiff could have performed the essential functions of his job with an accommodation.[2] Plaintiff argues that he could have returned to work on light duty or he could been allowed to remain on medical leave for a short period of time until he fully recovered. Dkt. # 45, at 20. Defendants assert that the City did not have a full time light duty position for police officers, and there was no accommodation that would allow plaintiff to return to work and perform all of the essential functions of a police officer. Dkt. # 33, at 15-20.

A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Adair, 823 F.3d at 1307. The Court must engage in a two step analysis to determine if plaintiff is a "qualified individual." First, the Court must determine if the plaintiff "can perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job

---

[2]  Plaintiff argues that defendants failed to brief the issue of whether he would qualify as disabled under a theory that defendants perceived or regarded him as disabled, and plaintiff claims that defendants' motions for summary judgment should be denied as to his ADA claim. Dkt. # 45, at 18 n.2. However, this would simply be another way to establish the first prong of his ADA claim, and proceeding under a "regarded as" theory does not relieve plaintiff of his obligation to show that he is a qualified person with a disability. Adair, 823 F.3d at 1306-07. The Court has assumed that plaintiff can show that he had a disability, and it is not necessary to consider this alternative basis for establishing the first element of his prima facie case of disability discrimination.

at issue." Hawkins v. Schwan's Home Service, Inc., 778 F.3d 877, 887 (10th Cir. 2015). The Tenth

Circuit has directed district courts to consider the following regulatory factors established by the

EEOC:

> Evidence of whether a particular function is essential to a job includes (but is not
> necessarily limited to) (1) the employer's judgment as to which functions are
> essential, (2) written job descriptions prepared before advertising or interviewing
> applicants for the job, (3) the consequences of not requiring the incumbent to
> perform the function, and (4) the current work experience of incumbents in similar
> jobs.

Id. The second step of the analysis comes into play if the employee is unable to perform an essential

job function, and the Court must consider whether there is any reasonable accommodation that

would allow the employee to perform that job function. Id. at 888. An employer's written

description prepared "before advertising or interviewing applicants for the job . . . shall be

considered evidence of the essential functions of the job." Adair, 823 F.3d at 1306.

The Court will initially consider whether plaintiff could perform the essential functions of

his job without an accommodation. Defendants have provided a written job description maintained

by the City listing the duties of a police officer, and plaintiff does not dispute that the description

is an accurate assessment of the duties of a police officer. Dkt. # 33-21. A significant number of

the major duties of a police officer concern the investigation of possible crimes and the apprehension

of suspects, and there are administrative duties associated with these tasks such as booking

prisoners, writing reports, and preparing search warrants. Id. at 2. Police officers are responsible

for enforcing traffic laws and collecting evidence from crime scenes. Id. There are also duties not

directly associated with law enforcement, such as responding to citizen complaints and meeting with

community groups. Id. The position requires knowledge about the criminal justice system and skills

such as operating a motor vehicle and using a firearm. <u>Id.</u> at 3. A police officer must also be able to perform the minimum physical demands as follows:

- The work is typically performed while intermittently sitting, standing or stooping. The employee occasionally lifts light and heavy objects, uses tools or equipment requiring a high degree of dexterity, operates police issued firearms and utilizes the appropriate physical dexterity and force to apprehend suspects.

- Must possess the physical strength and stamina to chase and subdue fleeting [sic] persons and rescue victims. This includes being able to walk and run long distances, jump and stand for long periods of time, crawl (to function in confined spaces), climb (to extreme heights), lift, drag, pull and push at least 165 pounds.

<u>Id.</u> at 4.

The final work status report submitted by Dr. Blackmon states that plaintiff has permanent physical restrictions of no lifting or carrying more than 20 pounds, no pushing or pulling more than 20 pounds, no squatting, kneeling, or crawling, and no climbing ladders. Dkt. # 45-38. Plaintiff argues that he could perform "the essential functions of the job," but his description of those functions does not include any of the physical components of serving as a police officer. Dkt. # 45, at 20. It is clear from plaintiff's response to the motion for summary judgment that he is referring only to the essential functions that could be performed by someone on light duty, and he makes no argument that there was an accommodation that would have allowed him to perform the physical functions of his job. Plaintiff's argument is based on a statement in Shirley's August 15, 2013 letter to plaintiff offering him a light duty position in which Shirley states that the light duty tasks listed in the letter are "essential to law enforcement." Dkt. # 45-4, at 2. However, defendants have presented evidence that they operate a small police department that does not have a full-time light duty position, and each police officer is expected to perform the full range of functions listed in the

job description provided by the City. Plaintiff's selective quotation from Shirley's August 15, 2013 is also misleading, because Shirley does not make any statement suggesting that the light duty tasks identified in the letter included all of the essential functions of a police officer. Dkt. # 45-4, at 2. It is clear from the letter that light duty is an accommodation that does not include the physical tasks associated with serving as a police officer, and the letter specifically states that light duty is "provided to you as an accommodation to physical restrictions established by your medical doctor." Id. The Court has reviewed the job description provided by the City and gives substantial deference to the employer's written description that includes physical tasks, such as patrolling on foot and apprehending suspects with the use of appropriate force. There is no evidence that plaintiff could perform tasks that required the use of physical force, such as apprehending a suspect or lifting objects or persons of greater than 20 pounds. The Court finds that the physical requirements contained in the written job description were essential functions of the job, and that plaintiff could not perform the essential duties of the job of a police officer without an accommodation. Therefore, the Court will next consider whether there was a reasonable accommodation that could have been offered to plaintiff to allow him to perform all of the essential functions of his job.

The determination of whether a requested accommodation is reasonable is specific to each case, and a court must consider the nature of the employee's disability and the requirements of the job. Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017). The ADA states that a reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . or other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). "'Whether an accommodation is

reasonable under the ADA is a mixed question of law and fact,' but 'an employee's request to be relieved from an essential function of [his] position is not, as a matter of law, a reasonable or even plausible accommodation.'" Punt, 862 F.3d at 1051 (quoting Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1123-24 (10th Cir. 2004)). In cases where an employee requests leave as an accommodation, the employee has the burden to produce evidence as to the expected duration of the requested leave to establish when the employee is likely to resume his regular duties. Hudson v. MCI Telecommunications Corp., 87 F.3d 1167, 1169 (10th Cir. 1996). "Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future and therefore whether the leave request is a 'reasonable' accommodation." Punt, 862 F.3d at 1051 (quoting Cisneros v. Wilson, 226 F.3d 1113, 1129 (10th Cir. 2000)).

Plaintiff repeatedly raises two arguments in his response in attempt to show that light duty or extended medical leave were reasonable accommodations. First, plaintiff argues that defendants violated the CBA by terminating his employment, because he had a contractual right to remain on medical leave or to be placed on light duty. Dkt. # 45, at 9, 14-16, 20, 23-24. Second, he claims that the City and Shirley intentionally interfered with his medical treatment and that his recovery was delayed due to their refusal to authorize appropriate medical treatment. Id. at 9-11, 13-14, 23. Neither of these arguments has any relevance to the issues raised by plaintiff's ADA claim. As to plaintiff's argument concerning the CBA, the Court will apply federal law to determine whether medical leave or light duty would qualify as "reasonable" accommodations, and it is irrelevant whether defendants' denial of these possible accommodations violated the CBA. It appears that the parties are litigating plaintiff's right to such accommodations under the CBA in a separate arbitration

proceeding, but plaintiff has cited no authority that an alleged violation of a CBA has any bearing to his ADA claim. See Dkt. # 45, at 6; Dkt. # 45-5. Plaintiff also argues that defendants interfered with his medical treatment and should be held responsible for delays in his treatment. However, evidence submitted by plaintiff directly refutes this argument. Plaintiff provided the deposition testimony of Leann Tunnell, the payroll and benefits coordinator for the City, and she testified that workers' compensation claims are referred to the workers' compensation insurer to determine a course of treatment. Dkt. # 45-34, at 2. She submits the paperwork to a caseworker who confers with the injured person and the City receives medical reports, but the City does not work directly with the injured person or the physician except as to arranging possible accommodations that would allow the injured person to return to work. Id. at 4. Plaintiff has provided evidence that Tunnell and another City employee had a personal opinion that plaintiff's treatment was taking an unusually long time, but there is no evidence that any employee of the City prevented plaintiff from receiving medical treatment. See Dkt. # 45-35, at 1-4 (e-mails between Tunnel and Angela Williams referencing plaintiff's ongoing medical treatment). The Court finds that plaintiff's arguments concerning alleged violations of the CBA or interference with his medical treatment have no relevance to the outcome of his ADA claim.

The Court has reviewed the evidence in the summary judgment record, and finds that plaintiff has not shown that there was a reasonable accommodation that would have allowed him to perform all of the essential functions of his job. Plaintiff argues that defendants could have allowed him to return to work on light duty or could have temporarily placed him on medical leave. Dkt. # 45, at 20. However, plaintiff was injured in April 2012 and he worked on light duty or stayed home on medical leave until 2015, and defendant did not initiate the process to terminate his employment

until June 2015 when it first learned that plaintiff had permanent physical restrictions. Plaintiff wholly ignores that he did receive an accommodation for over three years, and defendants gave plaintiff a significant amount of time to attempt to fully heal from his injuries. Plaintiff has submitted no evidence showing when he was likely to return to work without physical restrictions that would prevent him from performing the essential functions of his job, and he was effectively requesting a permanent light duty position or indefinite medical leave as an accommodation. Plaintiff has cited no authority that a permanent light duty assignment is a reasonable accommodation, and he has not carried his burden to show that he could have returned to work without physical restrictions in the near future. See Punt, 862 F.3d at 1051; Hudson, 87 F.3d at 1169.

Based on the finding that plaintiff was not a qualified person with a disability, the Court finds that plaintiff cannot establish a prima facie case of disability discrimination and defendant is entitled to summary judgment on plaintiff's claim of disability discrimination (first claim for relief). To the extent that plaintiff could be alleging a failure to accommodate claim, the Court's determination that there was no reasonable accommodation that would allow him to perform all of the essential functions of his job would also dispose of a failure to accommodate claim. See Dkt. # 45, at 25-27.

**B.**

Defendants argue that plaintiff cannot establish a prima facie case of retaliation under the ADA, because he never requested an accommodation of light duty and he did not suffer an adverse employment action contemporaneously with any protected activity. Dkt. # 51, at 10-11. Plaintiff claims that he continuously sought to be placed on light duty until defendants terminated his

employment, and there is sufficient evidence to establish a causal connection between his protected activity and termination.  Dkt. # 45, at 28.

To establish a prima facie case of retaliation under the ADA, a plaintiff must show "(1) that [the plaintiff] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." EEOC v. Picture People, Inc., 684 F.3d 981, 988 (10th Cir. 2012).  If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to show that it had a legitimate, non-discriminatory reason for the adverse employment action.  Id.  If the defendant states a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to show that the defendant's non-discriminatory is pretextual.  Id.

The parties dispute whether plaintiff engaged in any protected activity that could establish the first element of a retaliation claim.  Plaintiff claims that he repeatedly requested to be placed on light duty, and it appears that he is equating the work status reports submitted by his physician as a request by him to be placed on light duty.  Dkt. # 45, at 28.  The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] . . . ."  42 U.S.C. § 12203(a).  For the purpose of an ADA retaliation claim, "a request for accommodation is adequate if it is 'sufficiently direct and specific, giving notice that [the employee] needs a special accommodation.'"  Foster v. Mountain Coal Company, LLC, 830 F.3d 1178, 1188 (10th Cir. 2016).  There is no requirement that an employee make a formal or written request for an accommodation, but "the employer must know of both the disability and the employee's desire for accommodation for that disability."  EEOC v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011).  It is undisputed that defendants were aware of plaintiff's disability,

but it is less clear if plaintiff personally requested any specific accommodation or otherwise engaged in protected activity. Plaintiff states that "he engaged in protected activity when he repeatedly attempted to exercise his rights under the ADA in requesting the accommodation of light duty," but he cites no evidence in support of this statement. See Dkt. # 45, at 28. However, the Court finds that there is sufficient evidence to support an inference that defendants were aware of plaintiff's disability and that it construed the work status reports as a request for accommodation. On August 15, 2013, Shirley sent a letter to plaintiff directing him to return to work on light duty, and Shirley stated that "the Bixby Police Department finds that it can accommodate" the restrictions contained in the work status report. Dkt. # 33-11. A reasonable factfinder could construe this letter as evidence that defendants believed that plaintiff had requested an accommodation, and this would be protected activity under the ADA.

Plaintiff must next show that he suffered an adverse employment action, and it appears that he is arguing that there were two separate adverse employment actions. Plaintiff argues that the termination of his employment was an adverse employment action, but he could also be arguing that the termination of his light duty assignment in June 2014 was an adverse employment action. Dkt. # 45, at 28. It is undisputed that plaintiff's employment was formally terminated in August 2015, and defendants do not dispute that this was an adverse employment action. However, plaintiff appears to be arguing that the termination of his light duty could also be an adverse employment action. "In general, '[o]nly acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits' will rise to the level of an adverse employment action." C.R. England, Inc., 644 F.3d at 1040. Although plaintiff's pay and benefits did not

decrease after he was taken off light duty, it is apparent that all of plaintiff's light duty responsibilities were removed and the Court will assume that the removal of light duty in June 2014 constituted an adverse employment action.

The final element of a <u>prima facie</u> case of a retaliation claim under the ADA is that a causal connection exist between the adverse employment action and the protected activity. To establish a causal connection between these events, some courts have required a plaintiff to show that his protected activity was the "but-for" cause of his termination, but this standard has not been adopted by the Tenth Circuit. <u>See</u> <u>Nyanjom v. Hawker Beechcraft Corp.</u>, 2015 WL 2015 WL 2297934, *20 (D. Kan. May 26, 2015); <u>Purcell v. American Legion</u>, 44 F. Supp. 3d 1051, 1057 (E.D. Wash. 2014); <u>Bennett v. Dallas Independent Sch. Dist.</u>, 936 F. Supp. 2d 767, 783 (N.D. Tex. 2013). Evidence of temporal proximity between the protected activity and the adverse employment action is generally insufficient, standing alone, to establish causation for a retaliation claim. <u>Hennagir v. Utah Dep't of Corrections</u>, 587 F.3d 1255, 1266-67 (10th Cir. 2009). Plaintiff's sole argument as to a causal connection is that his workers' compensation claim adjustor, David Dalton, inquired on April 8, 2015 if defendants could accommodate plaintiff's restrictions, and defendants refused to allow plaintiff to return to work on light duty. Dkt. # 45-12, at 4. Plaintiff claims that defendants refused to authorize further medical treatment, even though plaintiff had not reached MMI, and he claims that this shows that defendants were seeking to terminate plaintiff's employment because of his protected activity. Dkt. # 45, at 28. The Court has already rejected plaintiff's argument that defendants interfered with his medical treatment and, in any event, it was over three years from the date of plaintiff's initial injury to Shirley's decision to terminate plaintiff's employment. This is a significant amount of time for plaintiff to heal, and this refutes plaintiff's argument that defendants

were seeking to terminate his employment without giving him time to heal. The Court also does not

find that a reasonable jury could infer that defendants intended to retaliate against plaintiff based on

their refusal to place him on light duty on April 8, 2015. Defendants have submitted evidence that

they do not have a full-time light duty position. Even if they did have such a position, they gave

plaintiff an opportunity to work on light duty for almost a year, and there was not enough light duty

work. Further, plaintiff's supervisors were unsatisfied with the quality of his work.[3] Plaintiff has

not shown that he provided evidence to his employer that he was likely to return to work without

restrictions in the near future, and he has cited no authority suggesting that an employer can be

found liable for retaliation by denying an unreasonable request for an accommodation.

The Court finds that plaintiff has not shown that there is any causal connection between any

protected activity and an adverse employment action, and plaintiff cannot establish a prima facie

case of retaliation under the ADA. Summary judgment should be entered in favor of defendant on

this claim. The Court has found that plaintiff has abandoned his FMLA retaliation and intentional

infliction of emotional distress claims, and no claims remain for adjudication.

---

[3]     Plaintiff argues that defendants' explanations for terminating his light duty assignment are
"shifting and inconsistent," because Shirley initially stated that there was not enough light
duty work, but evidence has subsequently been produced that plaintiff's supervisors were
dissatisfied with his work. Dkt. # 45, at 6. The Court does not find that plaintiff's argument
tends to show any discriminatory animus. Plaintiff's supervisors were dissatisfied with the
quality of his work, but Shirley has never offered inconsistent reasons for terminating
plaintiff's light duty assignment. In addition, one of the key reasons that Choate and Annis
were unhappy with plaintiff's performance on light duty was that he was distracting other
officers due to his own lack of work. Dkt. # 33-9, at 14; Dkt. # 33-17; Dkt. # 45-31.
Defendants have produced evidence to show that plaintiff's light duty work was
unsatisfactory to his supervisors and that there was not enough light duty work. These are
not mutually inconsistent explanations and the Court does not find that defendants'
explanations for ending plaintiff's light duty assignment were "shifting and inconsistent."

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and Brief in Support (Dkt. # 33) is **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Defendant's (sic) Errata Corrections to Deposition Testimony (Dkt. # 24) is **moot**.

**DATED** this 18th day of April, 2018.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE